IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

SHERRIE PETERSON,

     Plaintiff,

vs.

SHORTER UNIVERSITY, INC.,
DONALD V. DOWLESS, BEVERLY
HARPER, BRANDON WEISE, JOHN
REAMS, and TARA WARFIELD

     Defendants,

CIVIL ACTION FILE

No.

JURY TRIAL DEMANDED

## COMPLAINT

Sherrie Peterson ("Peterson") files this Complaint against International Shorter University, Inc ("Shorter"), Donald V. Dowless ("Dowless"), Michelle Stricklin ("Stricklin"), Candi Himes ("Himes"), Brandon Weise ("Weise"), John Reams ("Reams"), and Tara Warfield ("Warfield"), showing the Court as follows:

1.

Peterson is a citizen of South Carolina residing at 5 Aberdare Court, Greenville, South Carolina 29614-2401. At the time of the events complained of below, Peterson lived in East Cobb County, Georgia, and she commuted one and a half hours each way to Rome at to her job at Shorter.

2.

Shorter is a Georgia Corporation with its principal office located at 315 Shorter Avenue, Rome, Georgia 30165, and for purposes of this case it is considered a citizen of Georgia. Shorter's Registered Agent is its CEO, Donald V. Dowless, located at 315 Shorter Avenue, Rome, Georgia 30165. Shorter is subject to the jurisdiction of this Court.

3.

Dowless is a citizen of Georgia residing at 32 Owltown Drive, Elijay, Georgia 30536-9218. Dowless is subject to the jurisdiction of this Court over his person. Dowless is the President and CEO of Shorter.

4.

Harper is a citizen of Georgia residing at 3 Ridgeview Drive, SE Silver Creek, GA 30173-2327. Harper is  subject to the jurisdiction of this Court over her person.

5.

Weise resides at 149 Everett Springs Rd NE, Calhoun, GA 30701 and is a citizen of the State of Georgia. Weise is subject to the jurisdiction of this Court over his person. Weise worked at Shorter for 5 years and 8 months as the Assistant Technical Director of the School of Fine and Performing Arts after graduating from Shorter. He is now employed by Kennesaw State University as an Enterprise Audio Visual Specialist.

6.

Reams is a citizen of the State of Georgia residing at 10 Grayfield Drive SE, Silver Creek, GA 30173. Reams is subject to the jurisdiction of this Court over his person. Reams is currently the Provost of Shorter, making him an Officer of Shorter. At the time he was treating Peterson harshly and illegally, Reams was the Dean of the School of Fine and Performing Arts at Shorter.

7.

Warfield resides at 2 Whistling Oaks Dr Ne, Rome, GA 30165 and is a citizen of the State of Georgia. Warfield is   subject to the jurisdiction of this Court over her person. At the time she participated in the illegal treatment of Peterson, Warfield was an Associate Professor of Music. She is now the Interim Dean of the School of Fine and Performing Arts at Shorter.

8.

This Court has subject matter jurisdiction over this case under 28 U.S.C. 1332, as there exists a complete diversity of citizenship between the Plaintiff and the Defendants in this action, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.

Venue is proper in this District under 28 U.S.C. 1391(b) as all Defendants reside in this District and a substantial part of the events and omissions that are the subject of this action occurred in this District.

10.

Peterson worked for Shorter as a Professor and Director of Student

Productions in the Theatre Department at Shorter University from January, 2017

until August 14, 2020.

11.

Peterson was part of the faculty within the Theatre Department, which

offers Bachelor's of Arts Degrees—called a B.F.A in Theatre, with emphases

in either tech/design or academia/scholarship.

12.

Performance coursework for the tech/design track includes Theatre

Production, Makeup, Scene Painting, Theatrical Production,Welding, Stage

Management, Design, and more. The tech/design track guidesstudents either

towards professional work in that field or to graduate school tofurther their

education. At the time the events complained of Shorter had only two

students in technical—only Tempest Thomas and Brandon Kidd.

13.

The academia/scholarship track includes Directing, Theatre History,

Dramatic Literature, Period Styles, Acting, and more. This track is designed to

prepare students to enter graduate school in related fields.

14.

Shorter at the time also offered a B.F.A in musical theatre, as well as a B.F.A in vocal performance.

15.

Peterson was most heavily involved with the students in Shorter's BFA and musical theater program.

16.

Peterson directed several plays during her tenure at Shorter, including *Into The Woods*, *Carousel* and many more.

17.

Peterson was required to provide at least eight hours a week on advisement of students as part of her role as a theater professor at Shorter.

18.

Because she lived in East Cobb, and because of her directing responsibilities, Peterson often found herself returning to East Cobb fairly late at night, still needing to be out of her house early in the morning to return to Shorter the next day.

19.

Peterson was a key player in Shorter's delivery to the students on the academia/scholarship track of the opportunity to act in live theatre productions, both musicals and straight plays.

20.

One student delivered her thoughts about Peterson on August 23, 2021 in an email. She wrote that Peterson was a fantastic asset to the theater department, especially because Peterson was a working actor and artistic Director.

21.

The same student noted how well Peterson lived out her Christian faith in discharging her duties.

22.

While she was at Shorter, Peterson had responsibility in Shorter's efforts to recruit theatre majors. Therefore, she had distinctively close personal relationships with the students in the Shorter Theatre Department while she was there (as opposed to the Professors in other Departments which did not recruit students as actively).

23.

Peterson was fired by Shorter on August 14, 2020, just before the start of the 2020-2021 academic school year.

24.

Peterson currently has a charge pending before the EEOC concerning her firing. This action does not involve federal law claims, but only state law claims. If she is given a right to sue by the EEOC in response to her EEOC charge, she expects to file a second case against some or all of the present Defendants, and

possibly other Defendants, depending on what is discovered about her claims in the future.

25.

Prior to being fired, Peterson was the victim of a very public assault (in the civil tort sense) during a Shorter University student theatre performance of the play, "Carousel"-- which Peterson was actually directing-- on February 15, 2020. The assault was committed by Weise – a Shorter employee, junior to Peterson. His assault was committed as follows. Weise's position as assistant technical Director, frankly, was trivial to any objective observer in comparison to Peterson's responsibilities as professor and Director.

26.

Weise, in front of at least 85 witnesses crammed into the Shorter Theatre (which had been fairly recently remodeled and renamed the J.W. Tiscornia Theatre and had its grand opening April 4, 2019) for the performance of "Carousel" assaulted Peterson on February 15, 2020.

27.

The Tiscornia theatre in the theatre world wouldbe referred to as a black box theatre, meaning that it is small and intimate, not like the 1970s school auditoriums, we all remember seeing school plays in.

28.

In this very intimate setting, crammed with people, Weise, bellowing in a

hostile and threatening tone, in a very loud voice, in the small black box theatre,

Weise yelled for all in the theatre to hear, "SHERRIE I NEED TO SPEAK TO

YOU. RIGHT NOW!!!" Weise's demeanor, voice, bulging veins in his neck, his

aggressive hand gestures toward Peterson, and his menacing eyes placed Peterson

into a reasonable apprehension of receiving a violent verbal lashing from Weise,

and a violent injury because, Weise was obviously out of control in the small

theatre.

29.

Weise focused all of his immense rage on Peterson.

30.

Weise, clearly out of control was all over Peterson—so in an effort to defuse

the situation, Peterson left the theatre; and as soon as she could, helped a few

patrons relocate while ignoring Weise. For a few moments, this diffused the assault

and made it less public.

31.

Weise, a male and much larger than Peterson, is proud on his LinkedIn Page

of his having been a college lacrosse player. He is a large man by any standard,

and is certainly large in comparison to Peterson, justifying the fear that began to

overtake Peterson.

32.

Weise was described by at least one of the witnesses after this public confrontation with the Director of the play the crowd was watching as having committed workplace violence. This was a quote from a parent of one of the students performing on stage that night, who witnessed the entire confrontation. The witness was a parent of a Shorter student, seeing this in a "Christian" university.

33.

Weise thrusted his hands vigorously into Peterson's face, and her general personal space, and spewed his words into her face. Therefore, Weise created a reasonable fear and/or apprehension in Peterson making her wonder what he would have done if they had not been in such a public place. Peterson was horrified at Weise's behavior, not only because she did not understand it, but also because she had no idea what she had done to receive this abuse, or most materially, what Weise was going to do next.

34.

Peterson had previously been disrespected by Weise and he had not been disciplined, but this public display was so over the top it was a real shock to Peterson.

35.

The impropriety of a much larger man assaulting and battering Peterson in a very public Christian College setting was obvious to all in the theatre that evening. Even in the conservative bubble where Shorter exists, the Me-Too movement has raised people's awareness to the point that large males employees of any entity shouldn't try to persuade women fellow employees to do something they don't want to do, especially not by yelling in the much smaller woman's face, climbing all over her in public before at least 85 witnesses, so close that the man is spewing his rage on the woman, and maniacally pointing a very large finger and hand in the woman's face.

36.

Women are to be respected throughout society in our present culture, and that is even more so true at a conservative Christian University like Shorter. Weise's disrespect for Peterson was tolerated, ratified, and ultimately accepted as normal by the other individual defendants. When Weise left Shorter in 2021 to work at Kennesaw State, the individual defendants, even the women, gave the despicable Weise a big going away party, as if his assault on Peterson was completely forgotten. None of the Defendants held it against Weise that he never even apologized to Peterson.

37.

Weise went ballistic at Peterson, for no good reason, in public, violating Proverbs 29:11, which the other Defendants did not consider in the aftermath of the incident: "A fool gives full vent to his anger…." Shorter, the "Christian" college, in regard to this incident, abandoned what Shorter says it stands for, publicly onits website:

> Our ultimate source of authority is the Holy Bible, the written Word of God (2 Timothy 3:16-17). Since all truth emanates from God, we should indeed "examine everything carefully" (1 Thessalonians 5:21) and measure all philosophies and perspectives (Colossians 2:8) from a biblical worldview. While truth in varying forms and degrees can be found in every academic discipline and every culture, all information and knowledge must be analyzed in the light of the Truth (Jesus Christ- John 14:6) and His Word. Hence, we can fulfill the biblical mandate to make our "every thought captive to the obedience of Christ" (2 Corinthians 10:5).

38.

Given the University's claimed adherence to these principles, Weise should have been regarded as the fool he was, and Weise should have been severely reprimanded at the very least, because he had let his emotions break the captivity of Christ—really, he should have been fired immediately.

39.

Weise was not disciplined at all by any of the Defendants for his very public menacing behavior toward Peterson, which caused grievous injury to Peterson's right of enjoy the private property right Georgia law recognizes that  she had in her job at Shorter.

40.

When questioned about the incident later by Defendants, Weise lied and downplayed his outburst, even though what he had done was witnessed by most of the theatre crowd. The other defendants excepted his lies even though they were obviously refuted by what he had done publicly.

41.

Weise's later lies about what had happened between Peterson and himself should not have been credited by a single one of the other Defendants. But they made "friends with a hot-tempered man," and embraced the "one easily angered," violating Proverbs 22:24, while at the same time rejecting the victim Peterson, and so all defendants have now gotten themselves "ensnared." Proverbs 22:25.

42.

Defendants went 7 for 7 in violating this passage of the Bible they so heartily embrace:

There are six things the Lord hates,
Seven that are detestable to him;Haughty eyes;
 A lying tongue,
 Hands that shed innocent blood,
 A heart that devises wicked schemes,feet that are quick
 to rush into evil,
 a false witness who pours out lies,
 and a man who stirs up dissension among brothers. Proverbs    6:16-19.

43.

Shorter's general attitude is that the males, the "brothers," have superior status over women amongst its employees. The relevance of that Shorter attitude to the state law claims Peterson is advancing against the Defendants is that Defendants inexplicably (otherwise) accepted Weise's lies about what had happened in front of many witnesses, disbelieved Peterson, and ultimately fired her. Weise had a lying tongue, he was a false witness pouring out lies, and he stirred up dissension in the Theater Department. After his assault on Peterson, the other Defendants rushed into evil with quick feet, and devised wicked schemes to further victimize Peterson the victim.

44.

All the other individual defendants in doing so also intentionally interfered with Peterson's property interest in her job, and the individual defendants are each liable for the damages they caused in doing so.

45.

Peterson's "crime" which sent Weise into his psychotic rage, which would have put any woman of Peterson's size into reasonable apprehension of immediately receiving a violent injury, was Peterson's speaking with patrons who were sitting in chairs which Weise had placed in the gallery for the play, *"Carousel,"* in the wrong place—in the line of fire the choreography for the play.

46.

It was obvious that people shouldn't be sitting in chairs in the line of fire of the choreography. Why? Because during the first act of the play Peterson was directing (on the very night of Weise's assault), a student dancer injured herself running into (the occupied) chairs.

47.

At the time Peterson was having the chairs moved, it was questionable whether the dancer could return for the second act, even though the dancer could not be replaced on the fly, and the dancer's part could have been unfilled for the second act.

48.

Peterson had politely and reasonably asked the patrons sitting in the chairs which were placed in the area that had been "blocked" as a part of the directing effort as the area where the dancers would dance in the rehearsals for the play, simply to relocate. The patrons were gracious, understood the concern, and moved.

49.

No reasonable person in the world could ever have questioned this resolution. It was likely another dancer could collide with a patron in the area and injure the patron. Thus, Peterson was acting in Shorter's interest in making her reasonable request that members of the audience not be seated in the small area.

50.

Peterson had also specifically made arrangements with the theatre's Technical director, Ted Thomas, who was home sick, to place overflow seating against the far wall  (to where she was then moving the patrons), something that Weise should have known as he was standing in for Thomas in his absence.

51.

Weise's boss, Thomas, had already approved what Peterson did.

52.

At first Peterson thought Weise was upset that she was "undoing" what Weise had done in placing the seats in the wrong place, but before she was able to speak to him in the lobby, he also began shouting in the theatre, "You asked a patron to leave?!?!" to which Peterson could only say "No I did not. I will speak to you in a moment."

53.

Peterson continued to move the patrons out of harm's way to the adjacent wall, originally planned for overflow patrons. Those patrons were also parents of a student performing that night. Weise's position was that both these parents, in addition to the performers on stage, should not be made safe.

54.

*"Carousel"* is a play whose theme is not age appropriate for small children. It contains themes of incontrollable anger, attempted murder, and suicide. Many of the performers in the play were graduating seniors, and this play

would be their last at Shorter.

55.

Peterson was sitting in the audience enjoying the show with her own family that night when during the first act Peterson became very aware of a two-year old child one section over from where her and her family were sitting.

56.

The child was very disruptive in the first Act and this led Peterson to speak to Brandon Kidd, the child's uncle, who was also a student at Shorter. During intermission she made Kidd aware members of the audience's ability to hear and enjoy the play was lessened dramatically by the child's presence. Peterson's goal was to get Kidd's family to subdue the child, especially during the very dramatic death scenes in the second act, and also to prepare the child for the coming simulated gun shot in the attempted murder scene. Her words with Kidd were brief and poignant and she asked that he take care of it, but did not ask anyone to leave, nor did she assume that he would do that.

57.

Peterson had genuine concern for the child being exposed to the gunshot, and was worried also that the child's reaction and disruptiveness would ruin the second act for the rest of the patrons as well.

58.

During the first act, the two-year old had cackled and made other noises in the dead quiet of the theatre, while constantly moving in the tiny theater. The child was

even allowed to walk around in front of the family members onto the platform on which they were sitting.

59.

Obviously, this noise was disrupting the audience's ability to enjoy the play. Peterson felt she owed it to her patrons, many of them parents of students, and even to her student actors, to stop this distraction at intermission.

60.

Peterson did not ask the family to leave, although if they had any sense of manners or concern for others, much less "Christian" concern, that's exactly what they would have done.

61.

Though it was none of his business how Peterson dealt with the audience, Weise decided to intervene in this exchange, having gotten hysterically angry about his own erroneous belief that Peterson was asking the family to leave. After Weise got in Peterson's face, Peterson was at first dumbstruck at this second outburst, and quickly, stammering and frightful. Peterson was required by the situation to grovel to this subordinate employee, who personified that word, "haughty": The word *haughty* is defined by Merriam-Webster as "blatantly and disdainfully proud." The word is always used in the Bible in the evil sense of "arrogant, disdainful and setting oneself above others"; it is often set in contrast to

being humble.

62.

Peterson simply warned the family that a gunshot was coming in the

second act,as well as other content that was not age inappropriate for the toddler.

Weise's hysterical, crazy, and completely erroneous judgment was that not only

was that decision wrong, but that he should also unleash an attack on the person

who made that decision.

63.

It was clear that Weise was so enraged that he was completely unaware of

people watching his outburst and apparently did not have enough self-control to care

about his crazed display.

64.

What Peterson had done was laudable, but her explanation just

intensified Weise's rage, escalating her fear. Weise began to babble loudly,

wild-eyed, and screamed, "You asked a patron to leave!!" Trying hard to

keep from bursting into tears, Ms. Peterson meekly denied the charge of the

now completely out of control Weise.

65.

Peterson basically disengaged from Weise (fled) by taking the four

patrons to a safe location. The show had to go on despite Weise's assaulton

Peterson.

67.

Gathering herself, Peterson took a few deep breaths and said to Tempest

Thomas, the Stage Manager for the play, and the daughter of Shorter employed

Technical Director Ted Thomas, "That's it! What just happened can never happen

again!"—speaking about the volatile and abusive outburst that had just happened

by Weise.

68.

Weise's behavior, a man assaulting a woman in public like this—would not

be tolerated today in any business, and it certainly should not have been tolerated

at Shorter, a "Christian College." In another venue, it would have been entirely

possible that other men would have physically confronted Weise.

69.

Weise was bent on escalating the confrontation with Peterson even at this

point. He called Warfield on his cell phone, and he yelled into the phone at

Warfield—that is, until he realized Peterson was talking on the phone with his boss

Ted Thomas about Weise in the hallway as the intermission was ending. Apparently

realizing Peterson was talking to Thomas, Weise came barreling down the hallway

and got in Ms. Peterson's face (once again)  and said "OH THAT'S IT? THAT IS

IT, HUH? YOU ASKED A PATRON TO LEAVE!!!!!!" This was not a question.

This was a very scary verbal attack, clearly intended to muzzle Peterson in her

talking with Thomas.

70.

Theatre patrons (parents of students) labeled Weise's double assault on Peterson as workplace violence. No one in the world could ever legitimately deny Weise bullied Peterson with threatening behavior in very, very close proximity to Peterson, who was quite frankly still in shock at the evening's hostile attacks.

71.

Warfield had knowledge that Weise had been improperly aggressive in dealing with co-workers before, and in her supervisory position with Shorter, was negligent in allowing Weise to continue to work in the very close environment that was the theatre, and in failing to act against Weise when she had personal knowledge of the extent of Weise's rage. Lindsey v. Winn Dixie Stores. Inc., 186 Ga. App. 867 (1988).

72.

Peterson wrote an email that night to her supervisor Warfield, copying the Shorter Academic Dean who was then over the theatre program, Reams. In her email, Peterson recited all of the details of the assault, and asking for a meeting to discuss Weise's highly inappropriate attack on her.

73.

Weise had already reached out to Warfield and falsely attacked Peterson in an obvious pre-emptive strike.

74.

Prior to the evening in question, Warfield and Dr. Reams had been made aware that there had been a climate of hostility at other shows and among other directors and the technical theatre department in the past. Letters had been written by parents and faculty complained about this divide which had to be bridged.

75.

Accordingly, Peterson expected a private meeting with Reams and Warfield, but when the meeting occurred on March 4, 2020, and Peterson entered the conference room, Weise was present, along with Reams' executive assistant, Beverly Harper, and Tara Warfield, much to Peterson's surprise.

76.

Jumping straight into the meeting once Peterson arrived, Reams recited Peterson's charges, and the words that Peterson had used to describe Weise's behavior as: (abusive, hostile, volatile, menacing, etc.) Reams recited this summary coldly and without emotion, without any reaction toward Weise about what Weise had done.

77.

Nonetheless, after Reams' reading, Peterson rose up in her chair a bit to hear Reams "ream" Weise out. Instead, Reams turned to Weise and asked sympathetically, expecting Weise's pre-programmed denial, "Did you threaten Ms.

Peterson?" –to which Weise responded "No."

78.

The conversation turned out to be a witch hunt, with the female Peterson being the witch. Out of left field, Harper, whose presence in the room to that point was a mystery to Peterson, brought up that Peterson had been violating "Shorter policy" by reserving too many seats for her special guests for the actual play performances. This "policy" likely doesn't exist--Peterson was certainly not aware of it. Harper's comment and thinly veiled attack was simply Reams' and Harper's way of creating an equivalency between what Weise had done with the chairs, and something, anything, Peterson had done.

79.

Reams and Harper during the conversation, willfully suppressed the truth that had been confirmed by disinterested witnesses regarding Weise's actions. Reams, without further adieu, demonstrated that Reams and Harper had accepted, and Reams would act on, Weise's lies and Weise's false denials of Weise's assault on Peterson.

80.

The other Defendants took no action against Weise in response to his assault on Peterson either, and did not offer Peterson any protection from future male-on-female abuse from Weise. Weise was quickly delivered a get-out-of-jail-

free card.

81.

Reams and Harper, with fraudulent intent, concealed from Peterson what if any independent investigation Shorter had done concerning Peterson's charges against Weise, whether her witnesses or any witnesses were interviewed, what they said, etc.

82.

One witness to Weise's assault and attack on Peterson had written a letter to Peterson independently confirming what he saw so that it would not simply just be Weise's word against Peterson's. The author called what he witnessed, as workplace violence. This credible witness is a parent and successful business owner himself. His letter was completely discounted in this dispute.

83.

Two days shortly after the March 4, 2020 meeting, Peterson sent another email to Reams, stating that she was very unhappy with the way that the meeting had been handled. Peterson did not want to go to Shorter's Human Resources Department about what happened—at this point she could see her superiors and even her juniors, with impunity, were already casting her as the troublemaker. Instead, she hoped that her email to Reams would prompt Reams and Harper to conduct further inquiry about the circumstances of the assault. She wanted another meeting after that investigation a second meeting with the true facts before

the group, a proper resolution of her situation with Weise would be agreed upon,

by the imposition on him of some consequences for his assault on Peterson.

84.

Peterson very much desired to move forward, to resolve any animosity

Weise had toward her, to reach a point of reconciliation, and get back to work.

Shorter did nothing to facilitate this outcome.

85.

Shorter's response to Peterson's situation was very similar to the response

of male leaders in the Southern Baptist Convention to reports from women about

physical and even sexual abuse. The leaders blame the victim, such as Peterson,

and act in defense of the accused male, accepting the male's denials even when the

male perpetrator's acts are in plain sight.

86.

Dowless, at this point, did nothing to assist Peterson, or even acknowledge

the very significant issues she raised about having been assaulted by a junior male

employee of Shorter.

87.

Immediately following her initial meeting with Reams, Weise, Harper and

Warfield, Peterson left town to go to SETC, South Eastern Theatre Conference, in

Kentucky. There Peterson and Drew Davidson engaged in recruitment efforts of

theatre/music students for Shorter. Peterson managed Shorter's booth at the conference while Davidson was watching student auditions. Peterson also took part in professional development that would benefit the theatre program.

88.

Shorter's having Peterson performed this work confirmed that while Shorter would not punish Weise, Shorter did still see Peterson as a key employee of the theater program.

89.

Upon her return from SETC, Peterson realized Reams would do nothing else about the Weise situation.

90.

Thereafter, Peterson attempted to contact Dowless directly, but he did not respond to her attempts to contact him, and Dowless showed no concern whatsoever about the attacks that Weise had made on Peterson.

91.

Peterson never got the meeting that she had requested with Reams, Harper and Warfield to get to the bottom of Shorter's passive aggressive reaction to Weise's assault on Peterson. Peterson believes now during the late spring of 2020, that Reams, Harper and Warfield were instead plotting against Peterson.

92.

Defendants never made a further inquiry regarding the assault Weise

committed on Peterson, and Defendants did not discipline Weise in any way. There were no consequences for Weise, but devastating consequences for Peterson, plotted, schemed and delivered by the other individual Defendants.

93.

Defendants were engaged in a civil conspiracy against Peterson, intended to deliver the maximum possible damage they could to Peterson. They let her continuing working for a while, but silently they were sharpening their knives and preparing to fire her. But they didn't want just to fire her; they wanted to hurt her. So, they labored long and hard on the plan they would hatch under which she would be fired at the very beginning of the fall semester 2020, so that they could ensure she would not be able to obtain another job at a college as a Professor in a Theater Department. Hurting Peterson was very important to each individual Defendant, and they were very successful in fulfilling their goal of maximum damage to Peterson.

94.

Peterson continued working without further complaint through the Spring semester 2020, and Peterson attended a department wide meeting during the summer of 2020 that included discussion regarding her fall 2020 classes and the plays to be performed in the fall of 2020 under her direction.

95.

Defendants all represented to Peterson at the summer meeting that she would be employed by Shorter as a Theatre Professor for Fall Semester 2020.

96.

Peterson was instructed to attend what she expected to be university wide faculty meeting on August 14, 2020, but just prior to that meeting she was informed that she was being fired by Shorter. Reams delivered to Peterson a false reason for her firing, saying that budget constrictions required a firing.

97.

Regardless of any claimed budget constrictions, Dowless, Reams, Warfield and Harper conspired to fire, and did fire Peterson instead of Weise, as a result of

Weise's assault on Peterson, and her reaction to it, without disciplining Weise in any way.

98.

Proving Defendants' malice against Peterson, after Peterson was fired as a Professor, Peterson was denied the opportunity to adjunct teach at Shorter, despite Shorter's allowing other teachers that were laid off due to faculty reductions thereafter to teach in adjunct positions.

99.

When Shorter fired Peterson and refused her adjunct status, Defendants did not care that Peterson's classes and responsibilities being divided amongst her remaining colleagues at the very last minute before the semester started would force those colleagues into an overload, generally cheating the students in the drama department.

100.

Peterson's termination of her job at Shorter University just before the start of the 2020-2021 academic year prevented Peterson from finding a comparable teaching position at that late point in August 2020, as teaching contracts are made or renewed annually for Professors such as Peterson, months prior to the academic school year August-May begins. Having Peterson attend the first faculty meeting affirmed that Peterson would have a place at Shorter for the 2020-2021 academic year, but then the timing of her firing proved to be a real detriment she suffered

because of the relied on promise of a teaching position at Shorter for fall 2020.

### 101.

Being fired at the late date Defendants chose to fire Peterson, Peterson was not able to land a job comparable to the one she had at Shorter for the academic year 2020-2021, and she was not able to secure a position for the 2021-2022 academic year either.

### 102.

All Defendants knew that the timing Shorter chose for Peterson's firing, through the actions of Dowless and Reams, would preclude Peterson from obtaining another teaching position for the academic year 2020-2021, and therefore would lead to Peterson being unemployed. Defendants' actual intention in dealing with Peterson was to ensure that she was unemployed at least for the academic year 2020-2021.

### 103.

Peterson was not offered severance pay or any other settlement in connection with her firing, even though Defendants had actual knowledge that she would be without income because of the timing of her firing, and that she had two kids in college and needed to be able to assist with their expenses. They also knew when they fired Peterson that without an income, she would not be able to afford health insurance.

104.

For the specific purpose of intentionally inflicting emotional distress on Peterson, Reams, Harper and Warfield forced Peterson right then on Friday, August 14, 2020 to begin gathering all of her belongings and to have finally left Shorter's campus for good within two days, by Sunday, August 16, 2020.

105.

Students were arriving and/or settling in at Shorter over that weekend, August 14-16, 2020, and many of the students Peterson had directed and/or taught and/or recruited were present in the theatre building while Peterson was moving out of her office. Many asked her what was going on, puzzled, and many emotional conversations with the students followed.

106.

Defendants intentionally arranged the timing and circumstances of Peterson's forced departure to maximize the emotional damage she would suffer as a result of her being fired from Shorter, confirming their malice against Peterson.

107.

Defendants Reams, Harper, Warfield and Dowless knew that the chosen timing of Peterson's firing would be that she would lose her health insurance 14 days after her termination–at the specific time the entire world was facing a pandemic.

108.

Weise committed the torts of the assault, battery, and intentional infliction of emotional distress on Peterson in his confrontation with Peterson. Weise's behavior in public but also in the small confines of the Black Box Theatre were certainly sufficiently outrageous to support a claim of intentional infliction of emotional distress.

109.

Peterson had a protectable property interest in her at-will employment which the individual Defendants other than Dowless all illegally interfered with.

## COUNT ONE: INTENTIONAL INTERFERENCE WITH PROPERTY RIGHTS–ALL DEFENDANTS BUT SHORTER AND DOWLESS

110.

The fact that Peterson's employment with Shorter was at the will of Peterson and Shorter, respectively, did not make her employment at the will of other people involved with her employment. By OCGA 51-9-1 and the common law, third parties are prohibited from interfering with the property right of the employee such as Peterson in her at-will employment.

111.

An employee such as Peterson has manifest interest in the freedom of the employer to exercise its judgment without illegal interference or compulsion by

third persons with the property right Peterson had in her at will employment. Truax v. Raich, 239 U.S. 33 (1915), cited in Ott v. Gundy, 66 Ga. App. 684 (1942).

## 112.

Reams, Warfield and Harper each intentionally interfered with Peterson's property right in her employment, even though it was Dowless who had the power to fire Peterson.

## 113.

OCGA 51-9-1 prohibits unlawful interference of any kind with the enjoyment of an owner's private property in the following language:

> The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.

## 114.

One's employment, even if it is at will, is private property that can be interfered with wrongfully. Georgia Power Co. v. Busbin, 145 Ga. App. 438, rev'd on other grounds 242 Ga. 612 (1978).

## 115.

By creating a scenario which could and did lead to Peterson's ultimate total

loss of her private property right in her employment, and by his demonstrating complete lack of respect to Peterson as Director of the play "Carousel," in front of the entire audience present for the performance, and by his assaulting Peterson in public, Weise interfered unlawfully with Peterson's property right in her employment.

116.

OCGA 51-12-30, makes a joint wrongdoer, in a case of tortious interference with property rights, anyone "who maliciously procures an injury to be done to (the property right of) another," even if the defendant did not act to terminate the Plaintiff's property right. Reams, Harper and Warfield became joint wrongdoers liable to Peterson by advising, counseling, persuading and/or commanding each other, and conspiring with each other, that Peterson would be portrayed as the villain in the altercation with Weise, and Peterson would ultimately be fired. Melton v. Helms, 83 Ga. App. 71 (1950).

117.

These Defendants' actions were the proximate cause of Peterson's suffering extreme emotional pain and distress, and of damages to Peterson including lost wages, and other compensation due her regardless of the reason for her termination, future income, fringe benefits, and opportunities for advancement, all in amounts to be proven at trial.

118.

All Defendants except Shorter, and Dowless are liable to Peterson for the damages that were proximately caused to Peterson as a result of Defendants' unlawful interference with Peterson's enjoyment of her property right in her at will employment, including loss of income for two years at the rate of pay she had as a Professor at Shorter, plus damages in an amount to be proven at trial for the overall damage proximately caused to Peterson's career in  the future, in an amount to be proven at trial, plus damages for the emotional injuries Peterson has suffered as a proximate result of these Defendants' conduct, in an amount to be determined in the enlightened conscience of the jury.

## COUNT TWO: BATTERY COMMITTED BY WEISE

119.

Weise battered Peterson by unlawfully touching her in a manner that would be offensive to a reasonable person. Peterson's person was inviolable as to Weise, and Weise made the kind of contact (which by law, only has to be minimal) that is necessary for his actions to constitute battery.

120.

As to Weise's battery, the entire injury to Peterson was to her peace, happiness, and feelings, and therefore Peterson is entitled to a judgment against Weise  in an amount to be determined within the enlightened conscience of the

jury.

## COUNT THREE: ASSAULT COMMITTED BY WEISE

121.

The circumstances of Weise's one-sided confrontation with Peterson put Peterson, as a reasonable person, in apprehension of a violent injury about to be inflicted by the totally out of control Weise.

122.

Peterson experienced severe mental distress from apprehending the immediate violent injury Weise was about to inflict upon her.

123.

As to Weise's assault, the entire injury to Peterson was to her peace, happiness, and feelings, and therefore Peterson is entitled to a judgment against Weise in an amount to be determined within the enlightened conscience of the jury.

## COUNT FOUR: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS  COMMITTED BY WEISE, COMMITTED WITHIN THE SCOPE OF WEISE'S EMPLOYMENT WITH SHORTER

124.

Weise's conduct toward Peterson was within the scope of his employment

with Shorter.

125.

Weise's conduct toward Peterson was intentional, reckless, extreme, and outrageous.

126.

Weise's conduct was directed toward Peterson and Peterson alone.

127.

Peterson suffered severe emotional distress as a result of Weise's outrageous conduct. That Weise's conduct was atrocious, and utterly intolerable in a civilized Christian community captive at the time in a small black box theatre.

128.

That Weise's conduct was "workplace violence" and "harassment" was confirmed in texts and/or emails and/or letters to Peterson by several people in the audience.

129.

Peterson's emotional distress was so severe that she had difficulty functioning for several days after being victimized by Weise.

130.

Because Weise believed that he was advancing Shorter's interests in his

confrontation with Peterson, and he was not exploding for purely personal reasons, but rather trying in his mind to have as many people as possible watching the play, Weise committed his intentional torts within the scope of his employment with Shorter, and therefore Shorter is itself liable for Weise's intentional torts under the doctrine of Respondeat Superior. See OCGA 9-2-21: "An action for a tort shall be brought against the party committing the injury by…an agent in his employ."

131.

Shorter also ratified Weise's conduct directed at Peterson and therefore Peterson is entitled to a judgement against Shorter for her extreme emotional distress in an amount to be determined within the enlightened conscience of the jury because of that ratification.

132.

Peterson is entitled to a judgment against Shorter and Weise in an amount to be determined within the enlightened conscience of the jury, to compensate Peterson for the extreme emotional distress that Shorter and Weise imposed on Peterson.

## COUNT FIVE: BREACH OF PRUDENT MAN STANDARD FOR UNIVERSITY OFFICERS–DOWLESS, REAMS AND SHORTER

133.

As officers in Shorter, a non-profit corporation, Dowless and Reams were bound, when they were acting with discretionary authority, to act with the care that

an ordinarily prudent person in a like position would exercise under similar
circumstances.

134.

Shorter has respondeat superior liability for the actions of Dowless and
Reams as its officers.

135.

Dowless and Reams were personally bound as officers of Shorter  to
establish policies consistent with Shorter's Christian mission and not totolerate
Weise's behavior toward Peterson which violated those policies. Dowless and
Reams failed to establish personnel policies at Shorter that could be used to
discipline Weise, and therefore violated the prudent standard. They also violated
the prudent man standard by failing to discipline Weise. Those failures resulted
in Weise is being retained and Peterson being fired.

136.

The judgment of Dowless and Reams to retain Weise and to fire Peterson
was so completely outside what an ordinarily prudent person serving as an officer
of Shorter as a conservative Christian University would have done and certainly
violates the prudent person standard of care imposed on each of them by Georgia
law.

137.

Peterson is entitled to a monetary judgment against Dowless and Reams,

each individually and jointly, for the damages that Peterson suffered as a proximate result of the failure of each to perform their duty to act in the manner a prudent Officer of Shorter would have acted, if that prudent officer was confronted with the outrageous public attack Weise made on Peterson.

138.

Even in a secular workplace, Weise's conduct would normally have resulted in him being fired instantly. In a Christian workplace, the decision to retain Weise and fire Peterson was an outrageous breach of the prudent person standard Dowless and Reams operated under as Officers of Shorter.

139

Dowless and Reams are each, individually and jointly, liable to Peterson for the consequential damages their negligence and willful misconduct and breach of the prudent officer standard have caused to Peterson, including lost income, lost reputation, lost future employment prospects, expenses she has incurred in having to move to Greenville SC attempting to mitigate the damages the situations described above have caused, and corresponding loss of her private property right in her employment, including all monetary damages recoverable under OCGA 51-9-1.

## COUNT SIX: PROMISSORY ESTOPPEL SHORTER, REAMS, HARPER AND WARFIELD

140.

By representing to Peterson at the summer 2020 meeting that Peterson had a job as a professor for the fall semester of 2020, and having her participate with them in preparation for that semester Reams, Harper and Warfield made a promise to Peterson which must be enforced as to them and as to Shorter under OCGA 13- 3-44 because injustice cannot be avoided unless it is enforced.

141.

Peterson is entitled to a judgment against Shorter, Reams, Harper and Warfield in an amount to be determined by the jury to be sufficient to compensate Peterson for the damages she suffered as a result of the defendants promise on which they reneged.

142.

Peterson is entitled to a judgment against Dowless, Reams and Shorter for the consequential damages their negligence and willful misconduct and breach of the prudent officer standard have caused to Peterson, including lost income, lost reputation, lost future employment prospects, expenses she has incurred in having to move to Greenville SC attempting to mitigate the damages the situations described above have caused, and corresponding loss of her private property right in her employment, including all monetary damages recoverable under OCGA 51-9-1.

## COUNT SEVEN: JUDGMENT AGAINST ALL DEFENDANTS FOR EXPENSES OF LITIGATION INCLUDING REASONABLE ATTORNEYS' FEES

### 143.

Defendants have acted in bad faith toward Peterson and have caused Peterson unnecessary trouble and expense, in a massive understatement.

### 144.

Accordingly, Peterson is entitled to a judgment against Defendants for her expenses of litigation, including reasonable attorneys' fees.

## COUNT EIGHT: PUNITIVE DAMAGES UNDER OCGA 51-12-5.1

### 145.

Defendants' conduct has been and remains to this very moment willful and wanton, oppressive, filled with legal malice, and showing such an entire want of care so as to raise the presumption of conscious indifference to consequences. Thus, Peterson is entitled to a judgment of up to $250,000 against each defendant for punitive damages; if the evidence shows any Defendant acted with specific intent to harm Peterson, Peterson is entitled to a judgment against the individual Defendants in the amount of $500,000 each to punish them and to deter them from ever again acting with specific intent to harm anyone. Defendant Shorter in that case is liable to Peterson in an amount not less than $2.5 million.

**WHEREFORE**, Peterson prays that the court grant her a judgment against

Defendants including the various components pled for above, FOR TRIAL BY

JURY, and for such other and further relief as the Court deems just and proper.

Respectfully submitted this 7ᵗʰ day of January,  2022.

**DALZIEL LAW FIRM**

*s/ Charles M. Dalziel, Jr.*

Charles M. Dalziel, Jr.

Georgia Bar No. 203730

31 Atlanta Street Suite 200

Marietta GA 30060

chuck@dalziellawfirm.com